Our next case in the morning is case 118781, Jane E. Blumenthal v. Eileen M. Brewer. Are the parties ready? You might want to move the microphone down right in front of you sir. Bring that down a little bit and we can see you better and we can hear you better. Very good. I represent Jane Blumenthal, the ambulant in this case. We are asking this court to reverse the decision and the opinion of the appellate court on the grounds that it explicitly refused to follow controlling authority of this court, namely the Hewitt case, Hewitt v. Hewitt decided in 1979. Over a century ago, the General Assembly made a policy decision that the state must have a legal monopoly on the creation of the marriage relationship, that there will be no common law, no judge-made marriage. In 1979, this court decided on the basis of that decision by the General Assembly that there would also be no common law divorce. That is, no use of judge-made or common law principles to replicate the types of remedies that can be found only under the Illinois marriage and dissolution of marriage. That decision stood unquestioned for 36 years until the appellate court's opinion in this case decided, yes, we are going to have a common law divorce. I am here to tell you that this court got it right the first time, that there is no basis for any reconsideration of what Hewitt provided because it is the correct result and it is the result that the General Assembly has mandated by the passage and never changing the prohibition on marriage and dissolution of marriage. What this case is about is whether this court was right in rejecting Marvin v. Marvin, the Palomoni case from California in 1976, which held that unmarried prohibitants could recover each other from each other as if they had been married on the basis of what they called Palomoni or maintenance and division of property arising solely out of a relationship without any independent economic basis. That's what Marvin did and that's what this court rejected then and that's what the appellate court and appellee in this case, Judge Brewer, wants this court to do here. What this case is not about, it is not about treating unmarried prohibitants differently than married people. It is not about that. It is not about disabling them. It is not about punishing them somehow for not having married. It is not about making them different than any other people who choose or who employ theories of implied contract to protect their interests. As the cases make clear and as Hewitt itself makes clear, if there is unmarried prohibitants may recover from each other on theories of implied contract as long as the claim as independent economic basis and does not arise solely from the relationship itself. Isn't that exactly what the appellate court said though? That the conclusion of the appellate court was not to recognize common law divorce as you said, but to allow unmarried prohibitants to bring the same causes of action as other people. But the causes of action that are asserted in this counterclaim before this court are not the same as unmarried prohibitants can bring against each other arising out of, I'm sorry, other people can bring against each other that have an independent economic basis. The claims asserted here explicitly arise out of the relationship and explicitly attempt to invoke the provisions of the Marriage and Dissolution of Marriage Act. Take a look at count two of the counterclaim. There is an explicit attempt to apply the standards of the Marriage Act to this case. Mr. Brunick, however though, isn't this case now moot based on the fact that there was a partition ruling made in October 2014? I think that four of the five counts are moot because they relate to the partition action and that was tried and has been resolved. I think that that would raise you to cut. But there is one count that I think is not. And that is count three of the amended counterclaim in which Judge Brewer attempts to have, to essentially get an interest in Dr. Blumenfeld's medical practice on the theory that some funds from the party's joint account went to purchase an interest in that practice. So I think that's not, that wasn't tried before Judge Brewer. If I understand your response to Justice Tice correctly, you're not saying that for all times and all purposes no such claim can be made as in this case, only if the counterclaim specifically relies on the quasi-marital relationship. I raised that to show that in this case there is an attempt to use, to replicate, to use the Marriage Act in a non-married, in a case between non-married people. But what I'm saying is that if there, if the claim arises that unmarried cohabitants live together and there is a claim that has an independent economic basis, such as one party buys a house and puts it in the other's name. Well, that would be an independent basis. There would be a remedy for that. I think there was one of the cases, Heiser versus Fleming, that was cited in the briefs where that happened. Or maybe it was payment of a mortgage. There was another case where one party bought some cars for the other party and put them in their name. Again, there would be recovery for that. That doesn't arise out of the relationship itself. Any two people who did that would have an implied contract claim. What does arise out of the relationship itself, and what is being asserted in this case, is a right to property of the other party and income of the other party, not based on any independent economic basis, solely because the relationship happened. Just like maintenance. That's what maintenance is. One party is entitled to be supported by the other for a period of time, or perhaps indefinitely, because they had a certain relationship. There is no investigation or no detailed investigation into exactly what the economic inputs from each party were. It is simply awarded on the basis of, on the one hand, need, and on the other hand, ability to pay. Is it at all significant, counsel, that at the time these parties lived together, your client and the defendant were legally barred from marriage or any other kind of state-sanctioned relationship? We addressed that in the brief, Your Honor. I think the answer is no, because, in fact, it was possible for them to get married. In fact, this is alleged in the counterclaim, which is what we have to go on here, because this was on the pleadings. The parties went to Massachusetts in 2005 and got a marriage license, but they never decided to marry. They could have married in Massachusetts. They could have stayed in Massachusetts. They could have done what the parties in the United States v. Windsor, the Supreme Court case that invalidated the Defense of Marriage Act. Those parties lived in New York. New York didn't recognize same-sex marriage. The parties went to Ontario and got married there. Alternatively, that could have happened here. They could have stayed in Massachusetts and got married. Alternatively, they could have filed an action, as people did in the Supreme Court of Krakow, seeking to overturn the ban on same-sex marriage. It was unconstitutional. Obviously, that would have been an inconvenient thing to do and a difficult thing to do, but it could have been done. These parties did not choose to do that, but it was a legal avenue that was available to them. Let me go back to the questions about what's actually pled here. I think you're talking about count three of the complaint. Yes. It states a constructive trust on the portion of Blumenthal's ownership interest in her practice that was purchased with funds attributable to brewers, earnings, or inheritance. Why isn't that more similar to the kinds of cases that you talked about before? One person owns the house. The other puts improvements in the house. One who puts improvements in the house can bring a cause of action. Why isn't that the same idea? Two reasons. Number one, the pleading doesn't actually say that. The pleading says that some funds from that account may have gone to her. It doesn't say they came from Judge Brewer. It says they came from the account, which was a commingled account for years. There is no allegation that Judge Brewer actually provided those funds, number one. Number two, it is not possible, it is not legally possible for a non-doctor to have an interest in a medical practice. The law prohibits it. We've cited whatever statute it is in the brief. The only way, the only way that Judge Brewer could have an interest in Jane Blumenthal's medical practice is if that interest were treated as marital property under the Marriage and Dissolution of Marriage Act and thereby would be accounted for by the court in making a judgment of dissolution of marriage. That's the only way it can be done. There is no other way. If that is what she is seeking, then she is seeking relief that is only available under the Marriage and Dissolution of Marriage Act. This is a pleading case, right? And the complaint was dismissed based on the idea that a complaint could not be brought for unjust enrichment because these were unmarried cohabitants, period. It was not really an analysis of each one of these counts, correct? Well, I guess having been in the trial court with Judge Martin, there wasn't, I mean, he dismissed it on the basis of Hewitt. But there was an analysis of these counts, sufficient, and in fact, sufficient to determine that they all came within the Hewitt decision. It wasn't just because, he didn't just look at it and say they're unmarried cohabitants, they can't assert claims. All of these claims were dismissed because... And he made a claim that count four, whatever it is, three, is barred by Hewitt, specifically that this claim is not about the contribution of one person to the benefit of the other. I can't say that Judge Martin made a specific finding about that. He just dismissed it on the basis of Hewitt. That's what actually happened. But again, a constructive trust won't work in this instance either. A constructive trust is not legally available to be used to convey an interest in a medical practice because it's not really a trust. It's just a legal remedy that says you get this interest. The only way that can happen, the only way that Judge Brewer could get an interest in Jane Boonfell's medical practice is if it's treated as marital property. In other words, if the parties are treated as retroactively married when they never were. And that's why we are saying that what the appellate court and Judge Brewer are trying to do here is to get this court to reverse Hewitt and accept Marvin v. Marvin, which this kind of recovery would be allowed under Marvin v. Marvin, what they call the Palomoni case. And in fact, I'd like to call the court's attention to a case that came down from the appellate court First District in June, which is cited in my reply brief. This was after I filed the original brief. Friedman v. Muller. It's the First District case. It's 141410, I think is the number. A case kind of similar in which one unmarried cohabitant sued the other, asserting all kinds of claims, both explicitly for Palomoni and also for various... There was a house that was involved that was supposed to be conveyed and wasn't. There were some claims that arose that were independent, economically independent of the cohabitational relationship. And in that case, the appellate court wrote an opinion, which I think really should be written in this case, in which it said, well, other than saying Hewitt wasn't good law anymore, which I think it's for this court to say, but the opinion that they wrote basically says the Palomoni claim in this case can't be sustained. There's no legal theory for awarding it. It's not a common count. It's not an implied contract. It's simply something that would be available only in a divorce. But as to the other counts, the ones that allege things arising, having an independent economic basis, those counts can stand and can proceed in the trial court. And I think that that is the same thing that we are facing here, except that there are no claims here that are independent of the relationship. They're all based on the relationship itself. And I think it's important to look at the complaint here, the counterclaim here, because from what I can see in my opponent's briefs, all of the arguments that are being made are policy arguments about how things have changed since Hewitt was decided, how the legislature has enacted various protections for unmarried couples or children or various other things. But I think, and I am reading Hewitt correctly, and I think I am, Hewitt basically says the policy decisions are to be made by the legislature, not by this court. If the legislature has not decided to change the result, if the legislature has not decided to change the policy against common-law marriage that led to the decision in Hewitt, it's not for this court to do it for them. And the answer that I think my opponent is trying to give to that is to say, well, Hewitt was just a judge-made rule. It's judge-made law. Judges made it. Judges can change it. I don't think that that is a fair reading of the Hewitt decision. I think the Hewitt decision is an effectuation of legislative intent and legislative policy. It is not a judge-made rule. This court did not decide we don't like unmarried people, we don't like people not getting married, so we're going to have a rule against it as a matter of common law. That is not what happened. What happened is this court looked at the legislature, looked at the law, looked at the statute, and said, if we allow the kind of recovery that was allowed in Marvin and is being asked for in Hewitt, if we allow that kind of recovery, then essentially we are recreating common-law marriage. And the legislature has said only the state can create a marriage. Judges can't do it. People acting privately by themselves can't do it. If they can, then it becomes a private contract, terminable at will. And it is not what the legislature intended, and pretty much most states don't either. There's been a lot of discussion in the briefs about the law of other states, but it seems to me the law here in Illinois is clear, and the decision of this court was clear. And I think it would be wrong and an intrusion on the province of the legislature for this court to change it. And also in the briefs I think we've gone into why we think it would be an invitation to the assertion of questionable claims, let's put it that way. When there's a marriage, there's a marriage. It lasts for a certain period of time. The Marriage Act describes certain consequences that follow, certain factors that have to be considered when parties are getting divorced. None of those parameters exist for this kind of claim. I mean, you don't know how long do the parties have to live together before they get married. Mr. Bernick, though, why do you insist that the recovery of her investment in Blumenthal's medical malpractice is actually dependent on their relationship? Why can't it just be an investment? Because they use the word investment, but it's not an investment. There was no check written. There was no amount. There's no interest. There's no nothing. It's like the only way you can characterize that, you can't characterize that as investment. It doesn't look like an investment. Let me turn that around. But if your money was used in – But it doesn't say it was her money. It simply said it came out of a joint account. Nobody knows. There's no allegation about whose money. Nobody knows whose money. But wouldn't there be a hearing on the exact amount? Well, at this point, Grant, we only have the evidence to go on, but it doesn't even say that it happened. It was on information and belief, and there's no amount given, and it doesn't say it was hers. I mean, you would expect a party to know about their own account and their own money whether they paid for something or not. Let me turn this around, if I may, just a bit. Suppose, as I think actually happened, that some of the money in the joint account went to pay for Judge Brewer's campaign expenses to become a judge. Is that an investment? Is that in the record? It's in the record somewhere. I don't know if it's in the record. I'm posing it as a hypothetical. I'm posing it as a hypothetical. I'm not saying it actually did. I think it did, but I'm not saying it did. It's a hypothetical. Would that be an investment? Under this theory, I guess it would. But I don't think that that makes any sense. It's not really what is going on here. What is going on here is not really any kind of an investment. This is an attempt to use implied contract law to create the remedies that are available only under the Marriage and Dissolution of Marriage Act. Even if it was an investment, even if it was, you still can't breach it. There's no legal avenue to breach it except the remedy under the divorce law that says if it's marital property, the court can divide it. There is no other way to do it. That's why I think it really can't be looked at as an actual investment. So does this case rise and fall on the pleadings? In other words, you can see that there could be a certain pattern where, in fact, there could be a claim for constructive trust based on unjust enrichment. There could be such if it were pled that way. But you're saying these counts are not pled to fall under the rubric of unjust enrichment. Is that what you're saying? I am saying that on the record that we have, on the pleadings we have, there is no claim. There is no real unjust enrichment claim. This is an attempt to import, in some counts, it's an explicit attempt to import remedies that are available only under the Marriage Act. And in order to do that, I think you'd have to overrule Hewitt. And that's what the appellate court thought, and that's what Judge Brewer is asking you to do. Overrule Hewitt. Make all of this available. I see that my time is up. You'll have time on rebuttals. You'll have time on rebuttals. Thank you, Judge. Thank you. May it please the court, Shannon Minter appearing on behalf of appellee Eileen Brewer. Your Honors, I'd like to make clear that not a single one of the counterclaims in any way rests on an assertion that there's any sort of presumption or constitutional or, excuse me, contractual claim or equitable claim that arises based just on the fact of the non-marital relationship itself. Claims asserted are established common law claims to prevent unjust enrichment through the imposition of constructive trust or restitution. None of them are any different than the claims or the remedies in cases about cousins in Heifer or the sister in Legate or the neighbors in a state of Milborn. These are just established common law claims. In fact, what we're asking the court to do is not to rule that just by fact of being in a non-marital relationship, you somehow are entitled to some property resolution, but just the opposite, just to get rid of the rule in Hewitt that says simply because a person has been in a cohabiting non-marital relationship, they're barred from the ability to assert and prove common law claims that are available to other folks. Mr. Minter, before you get into your argument, I just want to talk a little bit about the procedural nature of this case. Isn't it a little strange that an appellate court overrules a decision of this court? I mean, the posture that it came to us is with the appellate court basically saying, our case is no longer good law, rather than being critical of the decision in light of today's times, which I think they got to, which they had every right to do, even in an opinion where they would have indicated that they were forced to follow the law and the place to change it would be in the Supreme Court. So isn't the posture, I mean, it may have been here regardless. It would have been you taking the appeal, I think, instead of opposing counsel, and you sitting in that table versus over in that table. But would you admit that what the appellate court did here was a little bit unusual, a little bit rogue? Justice Thomas, I don't think it was, only because there is an established body of case law in Illinois that an appellate court can find that a decision, either its own decision or a decision of this court, has been implicitly overruled by subsequent legislative developments. But in any event, as you note, it's a bit of a moot point at this juncture, since certainly this court unquestionably has the authority to determine whether or not the rule in Hewitt continues to be good law. I did want to, just back on the procedural point for a minute, too, that the trial court below relied exclusively on Hewitt in dismissing the counterclaims. Ms. Blumenthal also raised concerns about the factual sufficiency of those claims, but the trial court didn't reach that issue, and the appellate court here, I think, correctly found that was error. It would have been better for the trial court to have addressed those at the time, but it's not appropriate to address them in the first instance on appeal, so I think the appellate court got it right that if, assuming that you hold the appellate court's conclusion that Hewitt is no longer good law, then the appropriate course would be to remand to the trial court and any concerns about the factual sufficiency of the claims could be addressed at that time. If this isn't based, if Hewitt's not necessary to the outcome, can you still prevail without us overruling Hewitt? Only on one claim, only on the claim that seeks a constructive trust on the medical practice. Is that the only claim at issue at this point? Are the rest moved or not? Oh, no, Your Honor, not at all. I mean, these claims were brought in the context of a partition action, and Ms. Brewer did ask the trial court to stay the partition hearing pending the appeal, but the trial court decided to move forward. That's fine. I don't think that poses any problems because all of the counterclaims are both jurisdictionally and substantively independent of the partition action, so on remand the trial court will simply consider them in the first instance. I don't think there's any problem. Justice Burke, you had asked with mootness about any of the other claims. So you disagree with opposing counsel in response to Justice Burke's question. He said it was moot except as to the count on constructive trust. I very much disagree, and I don't think the trial court would have permitted the appeal to go forward and the partition action to go forward if the trial court had thought that was going to moot out all of the counterclaims. That wouldn't make sense, and I don't think there's any basis for that. The counterclaims are independent. It just means the trial court is going to have to look at them again. I really am confused by that, sir. The partition went forward, obviously an equitable cause of action, and the court entered an order returning the down payment to the doctor and then split the equity of the house 70 percent for the judge, 30 percent for the doctor. And that's the partition claim. What else is being – what are you asking for in terms of the house beyond that and the other three counts? Well, for example, in count one sought constructive trust on whatever portion of the Kimbark house Ms. Blumenthal received in the partition, so that claim – So the 30 percent. Right, and asked for that to be considered in light of the couple's overall shared understanding that Ms. Brewer would subordinate her own financial earnings for the greater good of the household and that that ended up greatly contributing to the wealth of what's now the superior wealth of Ms. Blumenthal. The trial court did not take those factors into account in the partition, so that claim is still perfectly valid. She can seek a constructive trust on the portion of the Kimbark house that Ms. Blumenthal has now been awarded. Could it have been embraced in the partition action? Well, she did. That's why these were filed as counterclaims in the partition action. We think – When the court sat down and said, in terms of equity, the judge gets 70 percent, the doctor gets 30 percent, did any of these issues about who had contributed to the house and that kind of thing and mortgage payments and income and all those kind of things, was that played out, was that brought before the court in the partition action? Well, the problem, no, because – certainly not fully – because the trial court judge believed that he was barred by Hewitt from considering all of these counterclaims. He dismissed every single counterclaim based solely on Hewitt, which is how we ended up here before you all. Granted, this may not have been the most efficient way to litigate this case, but I don't think there was any problems about the continuing – jurisdictional problems about the continuing viability of the counterclaims. It just means that the trial court judge is going to have to look at them now in light of having already made a partition of the Kimbark house. But I did also briefly want to note in terms of count three and the argument that the relief slot is only available to a spouse, no, it's seeking constructive trust on the annual earnings of the practice or sales and proceeds of the practice, there's no problem with that, or in the alternative restitution of the funds, Ms. Brewer's funds that were used to purchase the practice in the first instance. That's on the record on page 191. There is, I believe, nothing in the record about any funds being used to support a judicial campaign. Your Honors, Hewitt was decided 36 years ago, and in the decades since then, we've seen very significant changes in Illinois' public policies. At the time, cohabitation outside of marriage was a criminal offense. It's no longer the case. The legislature 25 years ago removed criminal penalties for cohabitation, and then the U.S. Supreme Court, in a very significant decision, in Lawrence v. Texas in 2003, held that unmarried couples actually have a constitutionally protected right to enter into a relationship, an intimate relationship outside of marriage. That's a very big change. Those changes alone would probably warrant a reevaluation of whether Hewitt continues to be good law, but that's just part of the picture. The appellate court did a very thorough job of examining all of the policies at issue in Hewitt and concluded that all of them have not just been eliminated, but actually replaced by policies that point just the opposite way to Hewitt's rule. At the time of Hewitt, Illinois was one of three states that had not adopted no-fault divorce  to enter into private contractual agreements about property and support. That's totally changed. Illinois does have no-fault divorce now and has greatly liberalized the ability of spouses to make enforceable agreements about property and support. But has the legislature recognized common-law marriage? No. When the Hewitt court looked at the legislature's elimination of common-law marriage and protection of putative spouses, it did so in the context of all of these other policies about no-fault divorce, non-marital children, the criminalization of cohabitation, and in that context concluded that what the legislature was intending to do was to send a message that not just favoring marriage, which of course state policy still does, but establishing that marriage is the only family relationship that can receive any type of legal recognition or protection in Illinois, and even beyond that, that there was a public policy, and the court said this was implicit in the elimination of common-law marriage, not explicit, that there was a public policy of actually disfavoring and penalizing people who entered into other types of non-marital relationships, penalizing non-marital children and unmarried partners, both of which have now been held to be unconstitutional. But we now know that there's, let's put it this way, there's no longer in light of Illinois' current public policy any possible way to reasonably infer from the elimination of common-law marriage an intention or a public policy to punish or disadvantage or penalize or exclude unmarried partners from generally available legal protections, and we know that because the legislature itself has acted in many different ways to extend recognition and protection to non-marital children and unmarried partners. But on that point, Mr. Minard, in Hewitt we specifically said that this is a matter for the legislature to decide, and it's been 35 years since Hewitt, and on this point the legislature hasn't decided this particular issue. So how do you address that? And that made sense at the time in light of all those then-existing public policies, but this is not a situation where it would be reasonable or I think even permissible to expect the legislature to step in and solve the problems that have arisen over time as the gulf between the ruling Hewitt and the current public policies of the state has become wider and wider over these 36 years. And this is much more, this is a judicially created rule about non-statutory claims. This is a lot more like the situation in Carbon where this court held that after the legislature adopted no-fault divorce, it had to go back and look at its prior ruling that guardians couldn't initiate divorce proceedings, and the court concluded that was now in conflict with the divorce policy of the state that was hurting disabled spouses and that Illinois was out of sync with the rest of the country on that issue. Every single one of those factors is present here. But back to my question, at any time since Hewitt, with a specific acknowledgment by the court in Hewitt saying it's a legislative function, the legislator could have overruled the case by statute. I'm not sure that it so easily could have. Well, the appellate court apparently thought it was easy for them to. I understand, Your Honor. I mean, there's a reason that, you know, 47 other states permit these claims to go forward and not a single one of those states has that ever been accomplished by the legislature. It's always been by the courts because if you think about it, what kind of a law would it be? I mean, I suppose the legislature could literally enact a statute that said unmarried partners can bring the same common law property claims that are available to other persons, but that would be a very unusual kind of statute. I think a concern here is the argument that that's not at all what you're attempting to do here, rather that you're trying to import the Marriage and Dissolution Act into this relationship where there has been no marriage. And I think that's where we keep coming back, because the appellate court's main holding is unmarried people should have the same right to bring a claim as anyone else. There should be no bar to them bringing the same claim as anyone else. And yet your complaint does refer to the Marriage and Dissolution Act, which seems to suggest that that's exactly what you're trying to do. Yes, there's one count that refers to the factors, the equitable factors in the dissolution statute. Let's be very clear, however. The basis of that claim is the common law claim to prevent unjust enrichment. It is in no way alleging that simply because we were in a non-marital relationship, the dissolution statute applies and we should get an equitable division of property. Look, it might have been an artful to allude to those statutes, but there's nothing improper about it because the claim itself is based on preventing unjust enrichment. And when a couple marries, when a couple marries, there's an automatic presumption. It doesn't matter how they arrange their lives or live their lives. They could live in different corners of the state and never have made any joint efforts together at all. The statute presumes that they are making joint efforts, that any income or wealth coming in is going to the benefit of the household. That is a presumption that applies as a matter of law. Nothing like that applies to an unmarried, cohabiting couple. We're not asking the court to apply any such presumption to an unmarried, cohabiting couple. We're asking the court to give them the opportunity to bring common law claims to prove that, in fact, they did have an express or implicit agreement to pool resources, to subordinate, in the case of Ms. Brewer, her own financial earning power to the greater good of the household with the expectation that she would not be financially harmed by that at the end of the day. So it's not surprising that when a couple can prove, and they have to prove it, that they entered into an agreement to be a joint enterprise to pool their resources, that the resulting disposition of property may sometimes look very similar to what you're going to get in the disposition of a marriage. That doesn't mean you're treating them as spouses. One commentator, I think, put it well. We shouldn't confuse the presumption of joint efforts in partnership with the permissible inference of joint efforts in partnership by unmarried couples asserting these common law claims. And I assume all of the possible defenses to unjust enrichment would be there as well. Voluntariness, whether it was a gift, whether there was an expectation of return, all of those kind of ideas that you see probably more in the commercial setting, but all those defenses would still be available? Absolutely. And, you know, the common law has evolved in very adaptive ways to take account of the fact that there are interpersonal economic transactions between people who are not exactly at arm's length, you know, family members, sisters, neighbors. All of these doctrines already exist, and all we're asking is the court enable unmarried cohabitants to bring the same claims that others can. I'll just briefly say that. Mr. Minner, before your time runs out, I just want to get back to the legislative acquiescence thing. And I know that sometimes that's a nebulous concept. This court rules. The legislature is presumed to know what we ruled, and it's up to them to change it if they want. But rarely is the language so specific to support legislative acquiescence. And I brought it up, but I just want to read you the quote from Hewitt. The question whether change is needed in the law governing the rights of parties in this delicate area of marriage-like relationships involves evaluations of sociological data and alternatives we believe best suited to the superior investigative and fact-finding facilities of the legislative branch and the exercise of its traditional authority to declare public policy in the domestic relations field. So it's not just that the Hewitt court ruled. The Hewitt court ruled and gave. And 35 years, nothing.  Well, the difficulty, Your Honor, is there is literally not a statute that the legislature could amend. The legislature has never set forth a statute that says who has standing to bring common law property claims. That's what makes this so different than In re Scarla ZD where there was a comprehensive statutory scheme including explicit provisions about who has standing to bring a parentage or custody case. There's literally nothing like that here. The legislature, not only is there not a comprehensive statutory scheme, there's no statutory scheme at all. And I think this case is much more like the situation in Alvis where the court eliminated contributory negligence as a defense, noted that when that had been done in other states, it had always been done by the judiciary, noted it was a judicially created doctrine, and noted that- In Hewitt, however, this court identified very specific statutory provisions that are incompatible with the legal recognition of property rights as to unmarried couples. And not one of those provisions has changed. All remain on the books. All continue to embody the public policy of Illinois. No, sir. Every single one of those legislative policies has been changed. Every single one of them. With the exception, the state still doesn't recognize common law in marriage, but as I noted before, the interpretation that the court, at the time of Hewitt, put on the elimination of common law in marriage is simply incompatible with the legislature's subsequent actions to protect and recognize unmarried families. You cannot conclude that by eliminating common law in marriage, they intended to deprive all recognition to those families and actually to encourage policies disfavoring them when they have done that themselves. Thanks very much. Chief Justice, could I ask one further question? You may. You referred to the unjust enrichment. Are you basing that on an independent economic basis, as was argued by Mr. Burnick, and are all of your other accounts dependent upon the non-marital relationship and the change in the policy in the state of Illinois that you're arguing? The unjust enrichment claims, other than the claim relating to the medical practice, are based on the party's implied in law understanding, shared understanding, that they were arranging their lives such that Ms. Brewer would subordinate her earning power, potential earning power, for the greater financial good of the household with the understanding that she would not be financially disadvantaged at that at the end of the day, and at the end of the day what happened is that Ms. Blumenthal is leaving the relationship with vastly greater wealth and earning power. She would be unjustly enriched to permit that situation to stand. So the unjust enrichment is based, just as it would be if these were two friends, family members, neighbors. The fact that there was an intimate relationship involved here is really no one's business any longer. It's no longer criminalized, it's constitutionally protected, and it's irrelevant to the analysis of the common law claims to prevent unjust enrichment. What's relevant is the party's agreement about their property and their finances. And is that applicable only to your claim for unjust enrichment, that argument? No, sir, that's applicable to all of the claims other than the claim on the medical practice. Thank you. Thank you very much. Thank you, Mr. Madrid. Thank you, Your Honors. I'll be as brief as I can, even though we have limited time. I guess I really have to disagree about the interpretation of what went on before Judge Martin. We tried this partition case. All of this evidence came in. All of the evidence about the parties' relative contributions, that's what we spent two days trying. When the counterclaim was dismissed, there was no stay sought by anybody. No stay was sought. There was no motion for a stay filed. It never happened. Instead, Judge Brewer filed a notice of appeal, and the court made a rule 304A finding, and that's why this case is here. Is the trial partition in our record? What? Is the trial of the partition hearing in our record? No, it's not in the record because the record went up before the case was tried. That's why you don't have that in your record. So we don't know if there was discussion about one person's contribution being staying at home with the children in the household versus the other person going to work. All these issues that seem to be raised in the injustice in Richmond, we don't know if that was raised in the partition suit where the court ended up giving the judge 70% and the doctor 30%. What was raised in the trial of the partition suit was the economic contributions of the parties. That's what was tried. And the result was that Judge Brewer basically, after return of the contribution of the initial down payment, got the lion's share, and that was why, because she had all these economic contributions that she alleges in her counterclaim. That was the basis that happened. Judge Martin took the view, which I think was correct, that a lot of these counts are really just arguments about how the partition should proceed. They don't have an independent economic basis. They're not really claims. They're just arguments about how the partition should proceed anyway. These matters were raised. When the court made its judgment about what the partition should be, there was no reservation of jurisdiction. There didn't seem to be necessary to the court to have any reservation of jurisdiction because the court was trying a case and it was over.  I disagree strongly that that's somehow still a lie. I think it's either Moot or Reshchudikov or Barczyk or both. Just again to reiterate or to be clear, we are not saying that, I don't see how Hewitt could be read to penalize unmarried cohabitants. All it says, it doesn't penalize everybody, all it says is if you want the benefits of marriage, you've got to get married. It doesn't say you're disabled from doing anything just because you are an unmarried cohabitant. The only kind of claims that unmarried cohabitants can't raise are claims that would have been made if they had been married, but they weren't. Again, if you want the benefits of the marriage statute, you have to get married. That's all Hewitt says. It doesn't bar claims by unmarried cohabitants just because they're not married. I think that the direction of the court as far as legislative action in Hewitt was pretty clear that the legislature is supposed to make the change. I don't understand why it's being said that the legislature couldn't make the change. Of course, the legislature could make the change. It could say for cohabitational relationships of a certain duration, the party shall be entitled to use the remedies of the act. If they wanted to say that, they could. Wait, wait, wait. The Marriage and Dissolution Act? Yes. That's not the argument, though, right? The argument is that they're not asking to use the Marriage and Dissolution Act. So we're trying to play with what would the statute look like. Can you help us again? What is the alternative statute that could have been passed? The parties, unmarried cohabitants who live together for a certain amount of time may bring an unjust enrichment claim? No. The parties may access the remedies that are available under the Marriage and Dissolution Act. That's all it has to say. If the legislature wanted to do that, that's all they'd have to say. I think, and we've said in the brief, that they've gone the other way. What the legislature has done in the latest revision of the Marriage and Dissolution of Marriage Act, which takes effect on January 1st of next year, they've outlawed, they've abolished a whole bunch of common law actions that used to exist relating to domestic relations, the Hartfall Statutes, the breach of promise to marry. They don't want people suing each other on common law claims when they're not married. Mr. Bernick, you heard me ask about Hewitt's indication that there were provisions that were incompatible with legal recognition of property rights as to unmarried couples, and I think it was your position as well that not one of those provisions has changed, right? He said they have all changed. Who's right? Well, the legislature has certainly abolished the criminalization, I think that's what he's talking about, of cohabitation and a bunch of other things. But in terms of, the legislature has never changed the categorical abolition of common law marriage. Never. It's never even come close. And there are other, I mean, the legislature over the years since 1977, when the Marriage Act came into existence, I think in its current form, the legislature has made numerous changes to various provisions of the Act from time to time. For one thing, there is now going to be, as effective the first of this year, there are now guidelines for maintenance. There never used to be. The legislature enacted those because to reduce uncertainty among people about what the, reduce judges' discretion and increase certainty about what results would be. And what is being argued here for, which is this new cause of action for unmarried couples to assert against each other, would go exactly in the opposite direction. This court in the Scarlet ZD case involving a de facto parenthood, made the same observations that they made in Hewitt, in fact cited Hewitt, saying this is a matter for legislative determination. There are a lot of different interests involved here. There's a lot of complexity to it. The legislature is in a better position to do it. And besides, it's legislative policy. We are not dealing with the common law. The opponent says we are, but it seems to me that this is clearly a statutory decision and always has been a statutory decision. Marriage and divorce are purely statutory. They are not common law. That's been the law for 100 years. I think the court should consider whether this case even comes within the parameters of reconsidering Hewitt because I don't see the basis for it. I mean, there is no, nobody in particular here, this court said that Marvin was not to be the law in Illinois. The appellate court here is clearly trying to make it the law in Illinois, and if the court was right the first time, I don't see what's changed. I don't see what's changed. If there is a change, I think the legislature has to make it. That's what the court said in Hewitt, and there's a lot of argument about policies that have changed, but there's really no argument here. There is no, my opponents don't really argue that this court should be making policy. What they say is this simply is a common law thing. It's not statutory, and I think that if you read Hewitt, it's clearly not the case, and for that reason, we would ask the court to reverse the appellate court and reinstate the finding of the trial court dismissing the conduct. Thank you.  This order will be taken under advisement as agenda number 20. Mr. Burnick and Mr. Mentor, thank you very much for your arguments today, and you're excused at this time.